**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **DELTA AIR LINES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-3025** |
| | ) | |
| **BOMBARDIER INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>COMPLAINT</u>

Delta Air Lines, Inc. ("Delta") files this Complaint against Bombardier Inc. ("Bombardier"), showing the Court as follows:

## <u>INTRODUCTION</u>

1.      This is an action for breach of contract and a declaratory judgment related to Plaintiff Delta Air Lines, Inc.'s ("Delta") purchase of "C-Series" aircraft from Defendant Bombardier Inc. ("Bombardier"). Bombardier has breached its contractual obligations by refusing to honor millions of dollars in credits issued to Delta in connection with the delivery of C-Series aircraft. Bombardier has also repudiated its obligations under a related assignment agreement and guaranty executed in connection with Bombardier's assignment of its contractual obligations to an affiliate of Bombardier. Bombardier's past and continuing breaches have already caused Delta to suffer ███████████ in damages and are likely to cause even more damages going forward.

2.      The origins of this dispute date back to 2008, when Bombardier launched the C-Series with the goal of developing a long-range, single-aisle aircraft to compete with jets sold by global aerospace giants The Boeing Company and Airbus SA. At the time, Bombardier was a

successful manufacturer of regional aircraft, but had never manufactured aircraft with more than 100 seats. In developing the C-Series from scratch, Bombardier made a "bet the company" decision to enter a new and intensely competitive market, where it would take on much larger and better-financed competitors.

3.     From a technical perspective, the C-Series was a success. Potential customers lauded the aircraft's state-of the-art features, such as its use of composite materials to reduce cabin noise and improve fuel efficiency. In 2016, as part of its effort to modernize its narrow-body fleet, Delta placed an order for up to 125 of the C-Series aircraft. Bombardier stated that Delta's order, which was worth more than $5 billion based on the list price of the aircraft, was a "watershed moment" for the C-Series program.

4.     From a financial perspective, however, and notwithstanding Delta's order, the C-Series was a failure for Bombardier. Bombardier's development of the C-Series was beset by delays and cost overruns, causing Bombardier to incur billions in debt before finally bringing the aircraft to market. Bombardier's debt burden was so overwhelming that it sought and received government assistance in the form of a $1 billion investment by the government of Quebec, where Bombardier is based. But even that injection of cash proved insufficient to rescue Bombardier. By early 2020, Bombardier had no choice but to sell some of its most valuable assets to raise cash and reduce debt. As of March 2020, Bombardier has manifested its intent to exit the commercial aircraft business and transform itself into a much smaller company that now focuses on manufacturing private business jets.

5.     As part of its survival strategy, however, Bombardier has wrongfully sought to repudiate some of the fundamental promises it made to secure Delta's order for the C-Series. In particular, as an inducement for Delta to buy the C-Series, Bombardier agreed to issue credits that

Delta could use to purchase goods and services sold by Bombardier. Those credits were of great importance to Delta, which owns and operates a fleet of regional aircraft manufactured by Bombardier, and regularly purchases goods and services from Bombardier to maintain that regional fleet. When Delta first attempted to use the credits to acquire goods and services from Bombardier, however, Bombardier refused to accept them.

6. Bombardier's pretext for refusing to accept the credits relies on a strained interpretation of the parties' agreements. In reality, Bombardier has refused the credits merely because it has decided to exit the commercial jet business, including but not limited to the C-Series program, and would now like to avoid the significant cost of the promises it made to Delta when entering into the purchase agreement. Per the plain terms of the parties' agreements, however, Bombardier has no right to do so. Delta has therefore brought this action to preserve the benefit of the bargain it struck when it agreed to purchase C-Series aircraft from Bombardier.

## PARTIES, JURISDICTION, AND VENUE

7. Delta is a corporation organized and existing under the laws of the State of Delaware. Delta maintains its corporate headquarters in Atlanta, Georgia.

8. Bombardier is a Canadian corporation based in Montreal, Quebec. Bombardier regularly transacts business in the United States and, in particular, New York City. Bombardier has consented to the jurisdiction of this Court for purposes of the contracts at issue in this case, which are described further below.

9. This Court has subject-matter jurisdiction over this action based on diversity of citizenship as defined by 28 U.S.C. §1332. The amount in controversy in this action, exclusive of interest and costs, exceeds $75,000.

10.     Venue is proper in this Court because Bombardier has consented to personal jurisdiction and venue in this forum under Article 21.1 of the Purchase Agreement between Bombardier and Delta, as defined below.

## FACTUAL BACKGROUND

**A.     Delta's Business Relationship with Bombardier**

11.     Delta is one of the world's largest commercial airlines.  For decades, Delta has operated thousands of flights daily across an extensive domestic and international network.

12.     For much of its history, Bombardier has been a diversified manufacturing concern that, among other things, was in the business of manufacturing and servicing commercial aircraft. Bombardier manufactured and serviced regional aircraft such as its model CRJ-200, CRJ-700, and CRJ-900 aircraft.

13.     Delta and Bombardier are parties to several agreements under which Delta has purchased CRJ-200, CRJ-700, and CRJ-900 aircraft from Bombardier.  Delta, through its wholly-owned subsidiary Endeavor Air ("Endeavor"), operates CRJ-200, CRJ-700, and CRJ-900 aircraft within the Delta network.

14.     Bombardier has also been in the business of selling goods and services relating to its CRJ-series regional jets.  Delta regularly purchases goods and services from Bombardier for the purpose of maintaining Delta's fleet of CRJ-series regional aircraft.

15.     In or around 2008, Bombardier developed a new aircraft it called the C-Series. Through the C-Series, Bombardier hoped to enter the intensely competitive market for single-aisle "mainline" aircraft, which has traditionally been dominated by multi-national aerospace corporations like Boeing and Airbus.  Bombardier incurred billions in debt to finance development of the C-Series and to bring that aircraft to market.

**B.      Delta and Bombardier Enter into the Purchase Agreement**

16.      In April 2016, Delta announced its decision to order up to 125 C-Series aircraft from Bombardier.

17.      According to a Bombardier press release, Delta's order for C-Series aircraft was the largest in Bombardier Commercial Aircraft history and made Delta the C-Series aircraft's largest customer.  Bombardier stated publicly that, based on the list price of the aircraft, Delta's order had a value exceeding $5 billion.  Bombardier's President of Commercial Aircraft described Delta's order as a "watershed moment" for the C-Series program.

18.      On April 27, 2016, Bombardier and Delta entered into a Purchase Agreement governing Delta's order for C-Series aircraft (the "Purchase Agreement").  Per the Purchase Agreement, Delta placed a "firm order" for 75 aircraft with an option to purchase up to 50 additional aircraft.

19.      The Purchase Agreement specifies a "list price" for the C-Series aircraft, but effectively discounts that list price by obligating Bombardier to issue various "credit memoranda" to Delta on the delivery of each C-Series.  The Purchase Agreement permits Delta to use some of the credit memoranda to take discounts "off the nose" of each aircraft by applying the credit towards the "Aircraft Purchase Price."  One type of credit memoranda, however, called "Goods and Services Credit Memoranda," cannot be applied towards the purchase price of aircraft.  Delta may apply the Goods and Services Credit Memoranda only towards the purchase price of goods and services (other than aircraft) sold directly by Bombardier.

20.      The opportunity to obtain credits towards the purchase of goods and services sold by Bombardier was of great value to Delta.  Delta spends millions of dollars each year on such goods and services for purposes of maintaining its fleet of CRJ-regional aircraft.

## C.     The Goods and Services Credits

21.     The credit memoranda available to Delta are described in and governed by certain "Letter Agreements" executed in connection with the Purchase Agreement.  As initially executed, each Letter Agreement bears a unique identification number, is dated April 27, 2016, is signed by authorized representatives of Delta and Bombardier, and expressly "supplements the terms and conditions of" the Purchase Agreement.

22.     Letter Agreement No. LA-C0922-01, dated April 27, 2016 (hereinafter "LA-01"), applies to the 75 C-Series aircraft for which Delta placed firm orders under the Purchase Agreement (the "Firm Aircraft").

23.     Section 1.4 of LA-01 provides that Bombardier is to issue a "Goods and Services Credit Memorandum" (a "G&S Credit") to Delta on the delivery of each of the "75 Firm Aircraft." LA-01 specifies a value for each G&S Credit expressed in January 1, 2016 dollars, and adjusted to the actual delivery date of each aircraft using an economic adjustment formula set forth in the Purchase Agreement.

24.     Section 1.4 of LA-01 provides that Delta may apply each G&S Credit towards the purchase price of goods or services (excluding aircraft) purchased directly from Bombardier.

25.     At the time the parties entered into the Purchase Agreement, Bombardier sold goods and services relating to its CRJ-regional aircraft and the C-Series.  Section 1.4 of LA-01 contains no language restricting Delta's use of G&S Credits to the purchase of goods and services relating to the C-Series.  Nothing in LA-01 says that Delta cannot apply G&S Credits towards the purchase price of CRJ-related goods or services (excluding aircraft) sold directly by Bombardier.

26.     Letter Agreement No. LA-C0922-07, dated April 27, 2016 (hereinafter "LA-07") carries the subject line "Conversion Aircraft." LA-07 addresses Delta's rights to request the

conversion of certain C-Series aircraft from the CS100-series model to the larger CS300-series model. LA-07 defines the CS300-series model as the "Conversion Aircraft."

27. As initially executed, Section 3.4 of LA-07 provided that Bombardier would issue a G&S Credit to Delta on the delivery of each Conversion Aircraft.

28. Other than substituting the words "Conversion Aircraft" for "Aircraft," Section 3.4 of LA-07, as initially executed, is identical to Section 1.4 of LA-01.

**D.      Bombardier Assigns its Rights and Obligations Under the Purchase Agreement**

29. The Purchase Agreement provides that, with limited, specifically identified exceptions, neither party may assign, sell, transfer, change or dispose of (in whole or in part) any of its rights or obligations under the Purchase Agreement, without the other party's prior written consent.

30. In June 2016, the government of Quebec reached a deal with Bombardier to make a $1 billion investment in the C-Series program. As part of that investment, Bombardier and the government of Quebec formed a new partnership, called the C-Series Aircraft Limited Partnership, or "CSALP," to take over the C-Series program.

31. The Purchase Agreement permits Bombardier to assign its rights and obligations under the Purchase Agreement to CSALP, but only on conditions designed to carefully protect Delta's rights. One of those conditions was that Bombardier would remain jointly and severally liable with CSALP for the performance of all obligations under the Purchase Agreement. Bombardier also agreed that its assignment would not increase or adversely change Delta's costs, risks, obligations, liability or responsibility under the Purchase Agreement. As a further protection to Delta, Bombardier agreed to guarantee, unconditionally and irrevocably, CSALP's performance of all obligations under the Purchase Agreement.

32.     On August 26, 2016, Bombardier formally assigned all of its rights, title, and interests under the Purchase Agreement to CSALP.  At the time, Bombardier owned approximately 62% of CSALP and the Government of Quebec owned 38% of CSALP.

33.     Bombardier's assignment to CSALP was memorialized in the August 26, 2016 Assignment and Assumption Agreement (the "Assignment Agreement') to which Bombardier, CSALP, and Delta are parties. The Assignment Agreement was signed by authorized representatives of CSALP, Bombardier, and Delta.

34.     Under the Assignment Agreement, CSALP expressly assumed and agreed to perform, discharge, and fulfill all of Bombardier's responsibilities, liabilities, and obligations under and in connection with the Purchase Agreement and all Ancillary Agreements, including the Letter Agreements.

35.     The Assignment Agreement provides that Bombardier's assignment to CSALP will not subject Delta to any liability to which it would not otherwise be subject under the Purchase Agreement or any Ancillary Agreement, including the Letter Agreements.  Nothing in the Assignment Agreement modifies any of Delta's rights under the Purchase Agreement.

36.     Through the Assignment Agreement, Bombardier indemnified Delta against any and all claims, demands, causes of action, liabilities, judgments, losses, damages, costs, and expenses of any kind whatsoever resulting from or arising out of any increase to or adverse change in the cost, risk, obligations, liabilities, or responsibility of Delta under the Purchase Agreement as a result of the assignment to CSALP.

37.     Bombardier covenanted in the Assignment Agreement that its indemnification obligations to Delta would apply should there be any increase to or adverse change in the cost,

risk, obligations, liabilities, or responsibility of Delta under the Purchase Agreement as a result of Bombardier's assignment to CSALP.

38.     In connection with Bombardier's assignment to CSALP, Bombardier also signed a Guaranty dated August 26, 2016. The Guaranty identifies Bombardier as the "Guarantor" and Delta as the "Guaranteed Party."

39.     The Guaranty is signed by authorized representatives of Bombardier and Delta.

40.     Under the Guaranty, Bombardier unconditionally and irrevocably guarantees CSALP's performance of all obligations under the Purchase Agreement, including full and prompt payment to Delta of all amounts due and payable by CSALP under the Purchase Agreement.

41.     The Guaranty describes Bombardier's obligations as guarantor as irrevocable, absolute, independent, and unconditional.

## E.     Bombardier Sells a Majority Stake in CSALP to Airbus

42.     Bombardier continued to suffer financial losses on the C-Series program even after its assignment to CSALP. Bombardier eventually decided to sell a majority stake in CSALP to Airbus.

43.     As reported in a January 16, 2020 article in the *Wall Street Journal*, "Bombardier agreed to give control of its C-Series jets to Airbus in 2017 for no money upfront to rescue it. The new jet series had financially crippled the Montreal company after years of delays and billions of dollars of investment."

44.     In or around October 2017, Airbus and Bombardier entered into an investment agreement under which Airbus acquired a 50.01% interest in CSALP. Bombardier retained ownership of approximately 31% of CSALP. In an October 2017 press release, Airbus disclosed that "[a]t closing, there will be no cash contribution by any of the partners, nor will CSALP assume any financial debt." According to the same Airbus press release, the investment agreement

between Airbus and Bombardier "contemplates that Bombardier will continue with its current funding plan of CSALP and will fund, if required, the cash shortfalls of CSALP during the first year following the closing up to a maximum amount of US$350 million, and during the second and third years following the closing up to a maximum aggregate amount of US$350 million over both years …"

45.     Following its acquisition of CSALP, Airbus renamed the C-Series the A-220.

**F.     CSALP and Delta Amend LA-07**

46.     On December 31, 2018, CSALP and Delta amended and restated LA-07 (the "LA-07 First Amendment").  The purpose of the LA-07 First Amendment was to document an agreement between Delta and CSALP concerning conversion of certain A-220 aircraft from 100-series "Firm Aircraft" to 300-series "Conversion Aircraft."

47.     CSALP is a party to the LA-07 First Amendment in its capacity as the assignee of Bombardier's rights and duties under the Purchase Agreement.

48.     The LA-07 First Amendment refers to Delta as the "Buyer."  CSALP, in its capacity "as assignee of Bombardier Inc.," is referred to as the "Seller" as a result of Bombardier's assignment to CSALP.

49.     Section 3.4 of the LA-07 First Amendment provides that the "Seller" shall issue a G&S Credit to Delta upon the delivery of each Conversion Aircraft.

50.     Other than replacing references to "Bombardier" with references to the "Seller," Section 3.4 of the LA-07 First Amendment is identical to Section 3.4 of LA-07, as it was originally executed.

51.     In May 2019, Airbus changed CSALP's name to the Airbus Canada Limited Partnership ("Airbus Canada").

52.     On June 3, 2019, Airbus Canada and Delta entered into a second Amended and Restated LA-07 ("LA-07 Second Amendment").  The purpose of the LA-07 Second Amendment was to document additional agreements between Delta and Airbus Canada concerning "Conversion Aircraft."

53.     The LA-07 Second Amendment refers to the Airbus Canada as the "Seller."

54.     Airbus Canada is a party to the LA-07 Second Amendment in its capacity as assignee of Bombardier's rights and duties under the Purchase Agreement. Airbus Canada entered into the LA-07 Second Amendment as a result of Bombardier's assignment to CSALP and CSALP's name change to Airbus Canada.

55.     Section 3.4 of the LA-07 Second Amendment provides that the "Seller" shall issue a G&S Credit to Delta upon the delivery of each Conversion Aircraft.

56.     Other than replacing references to "Bombardier" with references to the "Seller," Section 3.4 of the LA-07 Second Amendment is identical to Section 3.4 of LA-07, as it was originally executed.

57.     In executing the First and Second Amendments to LA-07, Delta had no intention of modifying its rights with respect to the G&S Credits or how Delta could apply those Credits. Delta has always intended for the G&S Credits to apply to any good or service, other than aircraft, sold by Bombardier at the time the Purchase Agreement was originally signed, including CRJ and C-Series-related goods and services.

58.     LA-01 has never been restated or amended and continues to provide that Delta may apply G&S Credits towards the purchase price of any goods and/or services sold directly by Bombardier, excluding aircraft.

59. Article 19 of the Purchase Agreement, which governs "Assignment," has never been amended.

## G. Airbus Canada Delivers Aircraft and Issues G&S Credits to Delta

60. Through the date of this Complaint, Airbus Canada has delivered more than twenty A-220 aircraft to Delta pursuant to the Purchase Agreement.

61. All of the A-220 aircraft delivered to Delta as of the date of this Complaint have been 100-series "Firm Aircraft" under LA-01.

62. None of the A-220 aircraft delivered to Delta as of the date of this Complaint have been 300-series "Conversion Aircraft."

63. As required by the Purchase Agreement, on the delivery of each "Firm Aircraft," Airbus Canada has issued a G&S Credit to Delta. Each such G&S Credit is reflected in an invoice issued to Delta by Airbus Canada.

64. The invoices issued by Airbus Canada to Delta reference the Purchase Agreement and further provide that "Issued upon delivery" is a "Goods, Services & Support Credit Memo (LA-01; Art 1.4)."

65. As of the date of this Complaint, none of the G&S Credit Memoranda issued to Delta refer to LA-07, the LA-07 First Amendment, or the LA-07 Second Amendment.

66. As of the date of this Complaint, Airbus Canada has issued G&S Credits to Delta with an aggregate face value exceeding ███████.

67. Delta anticipates that Airbus Canada will make additional deliveries of A-220 aircraft to Delta in the future. Airbus Canada is obligated to issue a G&S Credit to Delta on the delivery of each A-220 aircraft.

**H.      Bombardier Refuses to Accept the G&S Credits**

68.      In June 2019, through its wholly owned subsidiary Endeavor Air, Delta placed orders with Bombardier for CRJ-related goods and services.[1]  Delta, through Endeavor, attempted to apply G&S Credits towards the purchase price of those goods and services.

69.      Bombardier did not accept the G&S Credits from Delta.  Bombardier insisted that Delta pay cash for the CRJ-related goods and services that Delta had ordered.

70.      Following its refusal of the G&S Credits from Delta, Bombardier placed Delta on credit watch.  Bombardier refused to deliver any further goods or services to Delta unless and until Delta made payment in full and in cash.

71.      Delta disagreed with Bombardier's refusal of the G&S Credits.  Delta, however, had an urgent operational need for the goods and services it had ordered from Bombardier because those goods and services were necessary to maintain Delta's fleet of CRJ regional aircraft.  Delta paid Bombardier in cash to remove itself from Bombardier's credit watch and to resume Bombardier's provision of goods and services which Delta (through Endeavor) had ordered directly from Bombardier.

**I.      Bombardier Exits Airbus Canada and Sells Assets to Raise Cash**

72.      On January 16, 2020, the *Wall Street Journal* reported that Bombardier "said it may exit" its partnership with Airbus "because rising production costs threaten future returns on its investment."  According to the article, "Bombardier said the need for additional cash to finance production of the commercial jets . . . may undermine any prospect of future profits, potentially forcing Bombardier to write down the value of the Airbus venture."

---

[1] Per Section 19.2 of the Purchase Agreement, Delta is permitted to assign any of its rights or obligations under the Purchase Agreement to a wholly-owned subsidiary.

73.     On February 7, 2020, the *Wall Street Journal* reported that Airbus was in "advanced talks to acquire Bombardier Inc.'s remaining stake in a commercial jet family that the Canadian company once said would transform it into a major global aviation player."  According to the *Journal*'s report, Bombardier "has been scrambling to reduce roughly $9 billion of long-term debt," and was in talks to sell off some of its core assets, including Bombardier's remaining stake in Airbus Canada.

74.     In February 2020, Bombardier sold its stake in Airbus Canada to Airbus for approximately $591 million.  As reported by *Forbes* on February 13, 2020, "[t]he deal marks Bombardier's exit from commercial aviation, with more divestitures expected as the Canadian manufacturer tries to reduce its crushing debt load of $9.7 billion."

75.     Prior to exiting the Airbus Canada partnership, Bombardier announced that it had entered into a definitive agreement to sell its regional jet program to Mitsubishi.  Under that deal, which is scheduled to close in mid-2020, Mitsubishi will acquire the maintenance, support, refurbishment, marketing, and sales activities for CRJ-series aircraft.

76.     Bombardier's pending sale of its regional jet business to Mitsubishi will, if consummated, qualify as a sale of a material portion of Bombardier's assets.  Following that sale, Bombardier will no longer be in the business of selling goods and services for CRJ-series aircraft or, at a minimum, Bombardier's offerings of such goods and services will be significantly diminished.

77.     Prior to entering into an agreement to purchase Bombardier's regional jet business, Mitsubishi was in the business of manufacturing airframes.

78.     Bombardier was required by Article 19.7 of the Purchase Agreement to require Mitsubishi to provide written assurance to Delta that Mitsubishi expressly assumes and will at all

times remain in compliance with the provisions of the Purchase Agreement and any other "Ancillary Agreements." Bombardier did not require Mitsubishi to provide the written assurance required under Article 19.7 of the Purchase Agreement.

## J. Bombardier Refuses Delta's Demand

79.     In a February 3, 2020 letter from its legal counsel, Delta gave notice that Bombardier was in breach of the Purchase Agreement and Assignment Agreement due to its refusal to accept G&S Credits from Delta (the "Demand Letter").

80.     In the Demand Letter, Delta further gave notice that Bombardier had breached its obligations under the Guaranty.

81.     In the Demand Letter, Delta demanded that Bombardier cure its breaches by retroactively accepting the G&S Credits and refunding the cash Delta had paid to Bombardier after Bombardier improperly refused to accept the G&S Credits.

82.     In the Demand Letter, Delta further demanded that Bombardier assure Delta that it will accept G&S Credits towards the purchase of goods and services directly from Bombardier, including but not limited to CRJ-related goods and services, in the future.

83.     For more than five weeks, Bombardier made no substantive response to the Demand Letter.  Through legal counsel, Delta sent a second demand letter on March 13, 2020.

84.     On March 17, 2020, Bombardier finally responded to the Demand Letter.  In its response, Bombardier claimed that the G&S Credits apply only to goods and services relating to A-220 aircraft and cannot be used for CRJ-related goods or services.  Bombardier denied any obligation to accept G&S Credits from Delta.  Bombardier also said that its March 17, 2020, letter did not include all of the reasons why Bombardier does not believe it is obligated to accept the G&S Credits for CRJ-related goods or services.  Thus, Bombardier apparently believes that it has

other grounds for refusing to accept the G&S Credits that it has refused to share with Delta, but which Bombardier may intend to raise in the future.

85.     Bombardier's stated reasons for refusing to accept the G&S Credits are pretextual. The Purchase Agreement does not say that Delta can only apply the G&S Credits to goods and services related to the A-220.  On information and belief, the real reasons for Bombardier's refusal of the G&S Credits is its precarious financial condition and related decision to exit the commercial aircraft business.

86.     Regardless of its financial condition and recent asset sales, Bombardier remains jointly and severally liable under the Purchase Agreement.  Bombardier also indemnified Delta under the Assignment Agreement, and irrevocably and unconditionally guaranteed the performance of all obligations under the Purchase Agreement.  Bombardier has breached the Purchase Agreement, Assignment Agreement and Guaranty by refusing to accept G&S Credits issued under LA-01 towards the purchase price of CRJ-related goods and services.  Bombardier also has repudiated its obligations under the Purchase Agreement, Assignment Agreement, and Guaranty by affirmatively denying that it has any obligation to accept G&S Credits towards Delta's purchase of CRJ-related goods and services.

87.     To date, no 300-series "Conversion Aircraft" have been delivered to Delta, and Delta therefore has not yet received any G&S Credits issued under LA-07.  As alleged below, on information and belief, Bombardier denies that it has any obligation to accept G&S Credits issued under LA-07 because LA-07 was amended after Bombardier assigned its obligations to Airbus Canada.  Thus, a justiciable controversy has arisen between Delta and Bombardier with respect to Bombardier's obligations under LA-07, which a declaratory judgment is necessary to resolve.

## COUNT ONE – BREACH OF THE PURCHASE AGREEMENT FOR REFUSAL TO ACCEPT G&S CREDITS

88.     Delta adopts and incorporates by reference the allegations contained in Paragraphs 1-87 as if fully set forth herein.

89.     The Purchase Agreement is a valid, legally enforceable contract.  The Purchase Agreement is governed by New York law.

90.     The Purchase Agreement is a contract for the sale of goods and is therefore governed by Article 2 of New York's Uniform Commercial Code.

91.     Delta has performed its obligations under the Purchase Agreement.

92.     Per Article 19 of the Purchase Agreement, Bombardier remains jointly and severally liable for the performance of all obligations under the Purchase Agreement.  As an assignor, Bombardier also remains jointly and severally liable under the Purchase Agreement as a matter of New York statutory and common law.

93.     The Purchase Agreement obligates Bombardier to accept G&S Credits from Delta towards the purchase price of goods and services sold directly by Bombardier.

94.     Bombardier has refused to accept G&S Credits from Delta towards the purchase price of goods and services sold directly by Bombardier.  Bombardier's refusal is a breach of the Purchase Agreement.

95.     Delta has been damaged by Bombardier's breach.  Delta has paid Bombardier ▇▇ ▇▇▇▇▇▇▇▇ in cash for goods and services that Delta should have been able to procure on a cashless basis by applying G&S Credits with Bombardier.

## COUNT TWO – BREACH OF THE PURCHASE AGREEMENT FOR FAILURE TO PROVIDE WRITTEN ASSURANCE

96.     Delta adopts and incorporates by reference the allegations contained in Paragraphs 1-95 as if fully set forth herein

97.     In 2019, Bombardier entered into an agreement to sell its regional jet program to Mitsubishi for approximately $550 million.  That sale, which is scheduled to close in 2020, qualifies as a sale of a material portion of Bombardier's assets.

98.     Mitsubishi is in the business of manufacturing airframes.

99.     Bombardier was obligated by the Purchase Agreement to require Mitsubishi to provide written assurance to Delta that Mitsubishi will at all times remain in compliance with the provisions of the Purchase Agreement and all other Ancillary Agreements entered into in connection with the Purchase Agreement.

100.    Following Mitsubishi's acquisition of Bombardier's regional jet business, Mitsubishi, and not Bombardier, will be in the business of selling goods and services for CRJ-series aircraft originally manufactured by Bombardier.

101.    In breach of the Purchase Agreement, Bombardier did not require Mitsubishi to provide the written assurance referred to in paragraph 99 above.  Delta has been damaged by Bombardier's breach in an amount to be proven at trial.

## COUNT THREE – BREACH OF ASSIGNMENT AGREEMENT

102.    Delta adopts and incorporates by reference the allegations contained in Paragraphs 1-101 as if fully set forth herein.

103.    The Assignment Agreement is a valid and legally enforceable contract between Delta, Airbus Canada, and Bombardier.

104.    Delta has performed its obligations under the Assignment Agreement.

105.    The Assignment Agreement provides that Bombardier shall indemnify Delta from any and all claims, demands, causes of action, liabilities, judgments, losses, damages, costs, and

expenses of any kind whatsoever resulting from or arising out of any increase to or adverse change in the cost, risk, obligations, liabilities, or responsibility of Delta under the Purchase Agreement.

106.     In the Assignment Agreement, Bombardier covenanted that its indemnification obligations would apply should there be any increase to or adverse change in the cost, risk, obligations, liability or responsibility of Delta under the Purchase Agreement.

107.     Bombardier's refusal to accept the G&S Credits from Delta has increased Delta's costs, risks, and liabilities under the Purchase Agreement.  Through the Demand Letter, Delta demanded that Bombardier indemnify Delta for those increased costs, risks, and liabilities. Bombardier refused to do so.  Bombardier's refusal is a breach of the Assignment Agreement.

108.     Delta has been damaged by Bombardier's breach of the Assignment Agreement in an amount to be proven at trial.

## COUNT FOUR – BREACH OF GUARANTY

109.     Delta adopts and incorporates by reference the allegations contained in Paragraphs 1-108 as if fully set forth herein.

110.     Bombardier and Delta are parties to the Guaranty.  The Guaranty is a valid and legally enforceable contract.

111.     Delta has performed its obligations under the Guaranty.

112.     Through the Guaranty, Bombardier unconditionally and irrevocably guaranteed to Delta full and prompt payment on first demand of any amounts owed under the Purchase Agreement when those amounts are due and payable.

113.     In the alternative to the Counts alleged above, Bombardier's refusal to accept the G&S Credits, and its wrongful refusal of Delta's Demand Letter, constitute breaches of the Guaranty.

114.     Delta has been damaged by Bombardier's breaches of the Guaranty in an amount to be proven at trial.

## COUNT FIVE – DECLARATORY JUDGMENT

115.     Delta adopts and incorporates by reference the allegations contained in Paragraphs 1-114 as if fully set forth herein.

116.     As of the date of this Complaint, the G&S Credits that Bombardier has refused to accept were issued under LA-01 and relate to the 75 "Firm Aircraft," as that term is defined in LA-01.

117.     Airbus Canada has not yet delivered any 300-series "Conversion Aircraft" to Delta, but Delta anticipates that such deliveries will occur in the future.

118.     LA-07, as amended and restated from time to time, obligates Airbus Canada to issue a G&S Credit Memorandum to Delta on the delivery of each Conversion Aircraft.

119.     Delta intends to use G&S Credits issued with respect to Conversion Aircraft to purchase CRJ-related goods and services directly from Bombardier, or from Mitsubishi, if Bombardier's sale of its regional jet program to Mitsubishi is consummated.

120.     Delta has taken the position that it may apply G&S Credits, whether issued under LA-01 or LA-07, towards the purchase price of CRJ-related goods and services purchased directly from Bombardier or Mitsubishi, as the successor-in-interest to Bombardier's regional jet program. As alleged above, Bombardier has already refused to accept G&S Credits issued under LA-01.  On information and belief, Bombardier also disputes Delta's right to apply G&S Credits issued under LA-07 towards the purchase price of goods and services sold by Bombardier and plans to refuse those G&S Credits if and when tendered by Delta.

121. Upon information and belief, Bombardier contends that, per the terms of the LA-07 First and Second Amendments, G&S Credits issued with respect to Conversion Aircraft can only be applied towards the purchase price of goods and services purchased directly from Airbus Canada, because Airbus Canada is defined as the "Seller" under the LA-07 Second Amendment. Delta disputes Bombardier's position because in the LA-07 First and Second Amendments, the parties made no changes to Section 3.4, which governs the G&S Credits, other than to replace the name "Bombardier" with the defined term "Seller." The changes from "Bombardier" to "Seller" in the LA-07 First and Second Amendments were made as a result of Bombardier's assignment of its rights and obligations under the Purchase Agreement to Airbus Canada, which the parties agreed would not increase any of Delta's costs, risks, or liabilities.

122. Moreover, on information and belief, Bombardier takes the position that Delta cannot apply any G&S Credits towards the purchase price of CRJ-related goods and services following the consummation of Bombardier's sale of its regional jet program to Mitsubishi because, after that time, CRJ-related goods and services will be sold by Mitsubishi, and not directly by Bombardier.

123. Delta's position is that, per Article 19 of the Purchase Agreement, Bombardier remains jointly and severally liable for the performance of all obligations under the Purchase Agreement, and Bombardier's sale of assets to Mitsubishi cannot change Bombardier's contractual obligations to Delta.

124. Bombardier's position and actions with respect to Delta's use of G&S Credits, and in particular with respect to the use and applicability of G&S Credits to be issued under the LA-07 Second Amendment, create an actual controversy between Delta and Bombardier with respect to their respective rights and obligations under the Purchase Agreement.

125.    An actual controversary of a justiciable nature, within the meaning of 28 U.S.C. § 2201, exists between Delta and Bombardier which is ripe for adjudication.  Delta faces uncertainty with respect to whether it will be able to use millions of dollars in G&S Credits to meet the ongoing maintenance needs of its large fleet of CRJ-series regional jets, or whether it will be forced to pay for such goods and services with cash.  Absent resolution by the Court, this controversy will continue to jeopardize Delta's legal rights and interests by requiring Delta to advance cash to Bombardier to procure necessary goods and services, despite Bombardier's precarious financial condition, and despite Delta's right under the Purchase Agreement to apply G&S Credits towards the purchase price of goods and services purchased from Bombardier.

126.    The uncertainty created by the parties' controversy over the use and application of G&S Credits can only be resolved through a judicial declaration of the parties' respective rights and duties under the Purchase Agreement.

127.    The Court should declare that Bombardier is jointly and severally obligated to ensure that Delta can apply G&S Credits issued with respect to Conversion Aircraft towards the purchase price of goods and services purchased directly from Bombardier or its successor(s), including but not limited to Mitsubishi.

## **PRAYER FOR RELIEF**

Delta respectfully requests:

1)    A judgment awarding Delta damages for all damages it has incurred as a result of Bombardier's existing breaches of contract, which as of the date of this complaint total ███████████████ and which will grow as Bombardier continues to refuse to accept G&S Credits for goods and services sold by Bombardier, together with prejudgment interest as allowed by law;

2)     A declaratory judgment declaring that under LA-07, as amended, Delta is entitled to apply the G&S Credits towards the purchase price of goods and/or services (excluding aircraft) purchased from Bombardier and/or Mitsubishi, as successor to Bombardier;

3)     All further relief the Court deems just and proper.

Respectfully submitted this 26th day of May, 2020.

**TROUTMAN SANDERS LLP**

*/s/* Stephen G. Rinehart
Stephen G. Rinehart
Stephen.Rinehart@troutmansanders.com

875 Third Avenue
New York, NY 10022
(212) 704-6000

David E. Meadows (Ga. Bar No. 500352)
David.Meadows@troutman.com
*(Pro Hac Vice to be filed)*
Alexandra S. Peurach (Ga. Bar No. 451333)
Alexandra.Peurach@troutman.com
*(Pro Hac Vice to be filed)*
Kasia Hebda (Ga. Bar No. 637324)
Kasia.Hebda@troutman.com
*(Pro Hac Vice to be filed)*
Kaylan Meaza (Ga. Bar No. 209159)
Kaylan.Meaza@troutman.com
*(Pro Hac Vice to be filed)*

Bank of America Plaza, Suite 3000
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (phone)
(404) 962-6778 (facsimile)

***Counsel for Plaintiff Delta Air Lines, Inc.***