```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                    :
DELTA AIR LINES, INC.,                                              :
                                                                    :
                                        Plaintiff,                  :            1:20-cv-3025-GHW
                                                                    :
                        -against -                                  :        MEMORANDUM OPINION &
                                                                    :                ORDER
BOMBARDIER, INC.,                                                   :
                                                                    :
                                        Defendant.                  :
                                                                    :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

      For years Bombardier, Inc. ("Bombardier") sold commercial jets to Delta Airlines, Inc.  In

2016, Delta agreed to buy a large number of Bombardier's newest jet—the "C-Series."  In their

agreement, Bombardier agreed to give Delta credits that it could apply towards "the purchase price

of other goods (excluding aircraft) and/or services purchased directly from Bombardier."  The

credits worked like a discount to the purchase price of each aircraft purchased by Delta.

      Years later, Bombardier sold a majority interest in the subsidiary that manufactured the C-

Series to the European aerospace giant, Airbus.  (Airbus eventually renamed Bombardier's former

subsidiary "Airbus Canada.")  After that transfer, Delta and Airbus Canada entered into an

agreement to modify Bombardier's original agreements with Delta.  The amendment provided that

references to Bombardier in the agreements would be "deemed to be" references to Airbus Canada.

      Bombardier ultimately sold its remaining interests in Airbus Canada to Airbus, completely

exiting the business.  Notwithstanding the fact that Airbus Canada is now a wholly separate

company in which Bombardier holds no equity interest, Delta has demanded that Bombardier let

Delta use credits issued by Airbus Canada to pay for goods and services provided by Bombardier.

Delta claims that Bombardier remains obligated to do so under the terms of its original deal with

Bombardier, which permitted it to apply credits to purchase goods and services from Bombardier. Delta's agreement to deem references to "Bombardier" as references to "Airbus Canada" unambiguously modified any right that Delta had to redeem the credits from Bombardier. As a result of the amendment, Delta can apply credits earned upon the sale of aircraft by Airbus Canada to the purchase price of other goods or services purchased directly from Airbus Canada, not Bombardier. Because Delta's own agreement unambiguously modified its ability to redeem credits issued by Airbus Canada for goods and services provided by Bombardier, Delta's claims against Bombardier for breach of contract must be dismissed.

## I.    BACKGROUND[1]

### a.    Delta, Bombardier, and the Canadian Regional Jet Program

Delta Airlines, Inc. ("Delta") is one of the world's largest commercial airlines. First Am. Compl. ("Am. Compl."), Dkt. No. 29, ¶ 17. Delta is a Delaware corporation headquartered in Atlanta, Georgia. *Id.* ¶ 13. Bombardier, Inc. ("Bombardier") is a diversified manufacturing company based in Montreal, Quebec. *Id.* ¶¶ 14, 18.

For many years, Bombardier manufactured and serviced commercial aircraft. *Id.* ¶ 20. Among the aircraft manufactured by Bombardier were its "Canadian Regional Jets" or "CRJs." *Id.* ¶¶ 6, 18. Bombardier manufactured several series of CRJs, including its model CRJ-200, CRJ-700, and CRJ-900 aircraft. *Id.* ¶ 18. "As the manufacturer of CRJ-series aircraft, Bombardier has been in the business of selling goods and services relating to the maintenance and operations of CRJs." *Id.* ¶ 19. Those goods and services included servicing its aircraft, the sale of spare parts, and training for maintenance and ground personnel. *Id.*

---

[1] Unless otherwise noted, the facts are drawn from the complaint and are accepted as true for the purposes of this motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Delta purchased a number of CRJs from Bombardier over the years.  Delta and Bombardier entered into a series of agreements related to the acquisition of CRJs, spanning the decades between 2000 and 2018.  *Id.* ¶ 20.  The contracts between Delta and Bombardier related to the CRJs "came to employ a common structure and form" over the years.  *Id.* ¶ 21.  Often, the parties signed a primary "purchase agreement," containing the base price of the aircraft.  *Id.*  Side letters or annexes contained other specific terms of the parties' deals.  Frequently, those letter agreements obligated Bombardier to issue "goods and services" credits to Delta upon the delivery of new aircraft.  *Id.* ¶ 21.  Those credits functioned like a discount to the purchase price—they permitted Delta to use the credits to purchase any good or service "purchased directly from Bombardier."  *Id.* ¶¶ 22, 30, 31.  None of the purchase agreements entered into between Delta and Bombardier related to Bombardier's CRJs contained language limiting the application of these credits to the particular model of aircraft that was being purchased.  *Id.*  According to Delta, the lack of such aircraft-specific limitations in its contracts with Bombardier regarding CRJs was "consistent with the parties' course of dealing in applying the goods-and-services credits."  *Id.* ¶ 24.  "Prior to 2019, Delta used, and Bombardier has accepted, goods-and-services credits interchangeably, as to any good or service sold by Bombardier."  *Id.*  The complaint describes several instances in which Delta was able to use credits acquired through the purchase of one series of CRJs to goods and services associated with other series of CRJs.  *Id.* ¶¶ 23-25.

### b.  Bombardier's C-Series Program

In 2008, Bombardier launched the development of a new single-aisle aircraft—the "C-Series."  *Id.* ¶ 2.  The program was described as Bombardier's "big bet" to drive revenue in its commercial jet business.  *Id.*  Bombardier's big bet was not a winner.  "The program was beset by long delays and extensive cost overruns."  *Id.* ¶ 3.  In October 2015, the company took a $3.2 billion write down on the value of the C-Series program, and it later accepted a $1 billion rescue package

from the province of Quebec. *Id.* ¶ 4. "It was against that backdrop – with Bombardier's very survival hanging in the balance – that Delta expressed interest in placing an order for C-Series aircraft." *Id.* The complaint alleges that given its desperate straits, in order to land an order from Delta, "Bombardier was willing to make valuable concessions to Delta extending across the entire scope of the parties' multi-layered business relationship." *Id.* ¶ 5.

Delta announced its intention to order up to 125 C-Series aircraft in April 2016. *Id.* ¶ 26. Delta's order was Bombardier's largest ever—and made Delta the largest customer for the C-Series. *Id.* ¶ 27. The potential value of the deal was substantial—over $5 billion. *Id.* As the parties negotiated the terms of the purchase agreement that would govern the order, Bombardier knew that Delta also intended to do substantial work to transform its fleet of CRJs—including the CRJ-700. *Id.* ¶ 28.

### c. The Purchase Agreement

On April 27, 2016, Delta and Bombardier entered into a purchase agreement governing Delta's order for C-Series aircraft. Purchase Agreement No. PA-C0922 (the "Purchase Agreement"), Dkt. No. 63-3; Am. Compl. ¶ 29. Pursuant to the Purchase Agreement, Delta placed a so-called "firm order" for 75 C-Series aircraft and obtained an option to purchase up to 50 more. Am. Compl. ¶ 29. The Purchase Agreement established a list price for each of the aircraft, which was to be adjusted based on the optional features selected and the timing of the aircraft's delivery. Purchase Agreement §§ 4.1–4.4. The purchase price for the aircraft was to be paid in installments prior to delivery, with the balance due upon delivery. *Id.* § 5.1.2. The balance of the purchase price due at delivery for each aircraft was to be made "net of the applicable Credit Memoranda" set forth in two specified letter agreements, one of which, Letter Agreement '01, is described in more detail below. *Id.*

4

Article 1 of the Purchase Agreement contains a series of provisions related to the interpretation of the agreement. Two of those provisions are particularly relevant to the Court's evaluation of the issues presented in this motion. First, Section 1.2 of the Purchase Agreement provides that "[t]he headings in this Agreement are included for convenience only and shall not be used in the construction and interpretation of this Agreement." Purchase Agreement § 1.2.

Second, Section 1.4 of the Purchase Agreement contains capitalized defined terms that apply throughout the Purchase Agreement. Section 1.4 introduces the list of defined terms with this statement: "In this Agreement the following expressions unless otherwise expressly provided, mean:" Two of those defined terms must be noted here. The term "Agreement" is defined to include not only the Purchase Agreement itself, but also letter agreements attached to the Purchase Agreement. Purchase Agreement § 1.4(d).[2] The term "Aircraft" is defined in pertinent part to mean "any or all the Bombardier C Series model CS100 aircraft to be sold and purchased pursuant to this Agreement . . . ." Purchase Agreement § 1.4(e).[3]

The Purchase Agreement also addressed the capacity of its parties to assign their respective rights under the agreement. As a general matter, the Purchase Agreement prohibits such assignments without the prior written consent of the other party to the agreement. Purchase Agreement § 19.1. However, there are a number of exceptions to that general prohibition. *Id.*

One of those exceptions anticipated the transfer by Bombardier of its rights and obligations under the "Agreement" to the C-Series Aircraft Limited Partnership ("CSLP"). Purchase

---

[2] Purchase Agreement § 1.4(d) (**"Agreement"** shall mean this Agreement, including its Exhibits, Annexes, Appendices, Schedules and those numbered letter agreements (referred to herein as either "Letter Agreement(s)" or "Letter Agreement No.___" when referring to a specific Letter Agreement), if any, attached hereto (each of which is incorporated in this Agreement by this reference), as they may be amended pursuant to the provisions of this Agreement.).

[3] Purchase Agreement § 1.4(e) (**"Aircraft"** shall mean any or all the Bombardier C Series Model CS100 aircraft to be sold and purchased pursuant to this Agreement (including any Option Aircraft which is the subject of an option exercise by Buyer). For the avoidance of doubt, in the event that this Agreement covers more than one aircraft, the expression "Aircraft" shall refer to any one or more of such aircraft as the context requires, or as otherwise expressly stated in the relevant provision of this Agreement.).

Agreement § 19.7.  As described earlier, the C-Series development program was under substantial financial pressure.  In June 2016, the government of Bombardier's home province of Quebec agreed to invest $1 billion in the C-Series program.  Am. Compl. ¶ 39.  As part of that investment, Bombardier and Quebec formed a new partnership—CSLP.  *Id.*  Bombardier intended to assign its rights under the Purchase Agreement to CSLP.  *Id.*  So, in negotiating the Purchase Agreement, the parties included a provision that permitted Bombardier to do so, subject to a number of express conditions.

Section 19.7 of the Purchase Agreement provided the following:

> Bombardier may assign, sell, transfer or dispose of (in whole or in part) any of its rights and obligations under the Agreement to CSeries Limited Partnership ("CSLP"), a limited partnership organized under the laws of the Province of Quebec, Canada and affiliate of Bombardier owned by Bombardier and the Government of Quebec, provided that (a) Bombardier shall remain jointly and severally liable with CSLP for the performance of all obligations under this Agreement and any other agreement entered into with CSLP or Bombardier in connection with the sale and purchase of the Aircraft, and (b) such assignment shall be subject to (i) prior written notice to Buyer, (ii) receipt by Buyer of a guaranty in the form attached hereto as Exhibit V, (iii) no increase to or adverse change in the cost, risk, obligations, liability or responsibility of Buyer, including with respect to taxes, and (iv) receipt by Buyer of an assignment and assumption agreement among Bombardier, CSLP and Buyer in form acceptable to Buyer (acting reasonably) whereunder, among other things, Bombardier will assign to CSLP, and CSLP assume all of the responsibilities, liabilities and obligations of Bombardier under this Agreement and any other agreement entered into between Buyer and either CSLP or Bombardier in connection with the sale and purchase of the Aircraft, and Buyer will acknowledge and consent to such assignment.

Purchase Agreement § 19.7.

A separate provision of the Purchase Agreement—Section 19.8—is triggered upon the sale of "all or a material portion of its stock or assets to another airframe or engine manufacturer in which Bombardier is not the surviving entity."  Purchase Agreement § 19.8.  Under those circumstances, Bombardier is required to provide written assurances to Delta regarding the quality of support for the C-Series program.  Section 19.8 read in full as follows:

> In the event Bombardier enters into any merger with or sale of all or a material portion of its stock or assets to another airframe or engine manufacturer in which Bombardier

is not the surviving entity or in the event Bombardier enters into any transaction to sell a majority interest in the C Series program to another airframe or engine manufacturer, Bombardier shall require such airframe or engine manufacturer to provide written assurances to Buyer that it will support Buyer's C Series with the breadth and quality of product support that is comparable to what the acquirer is providing Buyer in support of its other fleets of similar size, vintage and technology, and the acquirer expressly assumes and will at all times remain in compliance with the provisions of the Agreement and any other ancillary agreements entered into with Bombardier in connection with the purchase and sale of the Aircraft.

Purchase Agreement § 19.8.

### d. Credit Memoranda Redeemable for Goods and Services Pursuant to Letter Agreements

At the time that Delta and Bombardier entered into the Purchase Agreement, the parties also entered into a series of letter agreements—23 at first. Am. Compl. ¶ 33. Two of those letter agreements required Bombardier to issue "credit memoranda" upon the delivery of C-Series aircraft to be used to purchase goods and services from Bombardier. *Id.* ¶ 34. Letter Agreement No. LA-CO0922-01, dated April 27, 2016 ("Letter Agreement '01"), Dkt. No. 63-2, provides for the issuance of "Aircraft Credit Memoranda." The relevant provisions of Letter Agreement '01 at the time that it was executed are set forth below:

1.0 Aircraft Credit Memoranda

1.1 Aircraft Credit Memorandum

On delivery of each Aircraft, Bombardier shall issue to Buyer a credit memorandum in the amount of United States Dollars expressed in January 1, 2016 United States Dollars, adjusted to the date of such delivery using the Economic Adjustment Formula (the "Aircraft Credit Memorandum"). Buyer may apply such credit memorandum towards (i) the Aircraft Purchase Price of the applicable Aircraft, or (ii) the purchase price of other goods (excluding aircraft) and/or services purchased directly from Bombardier . . . .

1.4 Goods and Services Credit Memorandum

On delivery of each Aircraft, Bombardier shall issue to Buyer a goods and services credit memorandum in the amount of [REDACTED] United States Dollars expressed in January 1, 2016 dollars, adjusted to the date of such delivery using the Economic Adjustment Formula. Buyer may apply such Goods and Services Credit Memorandum towards the purchase price of goods and/or services (excluding aircraft) purchased

directly from Bombardier as described in Article 1.1 above.

Letter Agreement '01 § 1.0.

Letter Agreement No. LA-C0922-07, dated as of April 27, 2017 ("Letter Agreement '07"),

Dkt. No. 63-1, contains similar provisions related to the issuance of credit memoranda. Letter

Agreement '07 contemplates the prospect that rather than purchasing "Aircraft"—defined under the

Purchase Agreement to refer to C-Series Model CS100 aircraft—Delta will convert those orders to

orders for a higher model C-Series aircraft—the CS300. Letter Agreement '07 provides for the

issuance of four separate categories of credit memoranda—"Conversion Aircraft Credit

Memorandum," "Conversion Aircraft Optional Features Credit Memorandum," "Conversion

Aircraft BFE Credit Memorandum," and "Goods and Services Credit Memorandum." Letter

Agreement '07 §§ 3.1–3.4. While the language of each provision differs, they are very similar in

concept—purchases by Delta of C-Series aircraft (or investments in optional features), are

incentivized through the issuance of credit memoranda by Bombardier to Delta. Those credit

memoranda can be applied for substantially the same purposes in all three categories—the purchase

price of the relevant Model CS300 aircraft or "the purchase price of other goods (excluding aircraft)

and/or other services purchased directly from Bombardier as described in Article 3.1 above." Letter

Agreement '07 §§ 3.2–3.4.

The full text of Section 3.4 of Letter Agreement '07 is set forth below:

3.4    Goods and Services Credit Memorandum

On delivery of each Conversion Aircraft, Bombardier shall issue to Buyer a goods and
services credit memorandum in the amount of United States Dollars expressed in
January 2016 dollars, adjusted to the date of such delivery using the Economic
Adjustment Formula or the Option Aircraft Economic Adjustment Formula, as
applicable. Buyer may apply such Goods and Services Credit Memorandum *towards
the purchase price of goods and/or services (excluding aircraft) purchased directly from Bombardier* as
described in Article 3.1 above.

Letter Agreement '07 § 3.4 (emphasis added).  The referenced Section 3.1 provides more detail regarding the types of goods and/or services that can be purchased using credits, "such as:  spare parts, flight crew training . . . , maintenance and ground personnel training, on-site technical assistance . . . , and technical manuals."  *Id.* (some internal punctuation omitted).  Again, all of the credit memoranda issued under Letter Agreement '07 as it was in effect at the time of its execution permit the application of the credits to the purchase price of goods and services, using the language that is italicized above.

### e.  Bombardier's Assignment to CSLP

On August 26, 2016, Bombardier implemented the anticipated assignment of its rights and obligations under the Purchase Agreement to CSLP.  Am. Compl. ¶ 41.  At the time, Bombardier owned approximately 62% of CSLP and the province of Quebec owned the remainder.  *Id.*  The assignment was implemented pursuant to an assignment and assumption agreement among CSLP, Bombardier and Delta.  Def.'s Decl. in Supp. of Mot., Ex. 11 (the "Assignment Agreement"), Dkt. No. 47-11.  Pursuant to the Assignment Agreement, Bombardier assigned all of its rights and interests in the Purchase Agreement and its related ancillary agreements, including the letter agreements described above, to CSLP.  Assignment Agreement § 1.  CSLP agreed to perform Bombardier's responsibilities under those agreements.  *Id.* § 1.2.  Delta consented to the assignment.  *Id.* § 1.3.  The complaint accurately alleges that "[n]othing in the Assignment Agreement modifies any of Delta's rights under the Purchase Agreement."  Am. Compl. ¶ 44.

The Assignment Agreement contains a number of provisions that protect Delta against adverse consequences of the assignment.  In particular, Bombardier agreed to indemnify Delta from "any and all claims . . . losses, damages costs and expenses of any kind whatsoever . . . resulting from or arising out of any increase to or adverse change in the cost, risk, obligations, liabilities or responsibility of Delta under the Purchase Agreement or any Ancillary Agreement . . . as a result of

the assignment of the Purchase Agreement and the Ancillary Agreements to CSALP under and as provided in this Assignment Agreement."  Assignment Agreement § 5.

Moreover, in connection with the assignment, as required by the Purchase Agreement, Bombardier agreed to guarantee the performance by CSLP of the obligations that it had assumed. That obligation was documented in a guaranty agreement, dated August 26, 2016, Def.'s Decl. in Supp. of Mot., Ex. 12 (the "Guaranty"), Dkt. No. 47-12, between Delta and Bombardier.  Pursuant to the Guaranty, Bombardier agreed to guarantee to Delta "the full and prompt payment" of amounts due under the Purchase Agreement and its ancillary documents, and "the performance of all undischarged obligations . . . under the Agreements due in accordance with and subject to the terms and conditions thereof *as from time to time in effect*."  Guaranty § 1(a) (emphasis added).

The Guaranty anticipates that the Purchase Agreement and related agreements would be amended from time to time.  The Guaranty specifically permits Delta, as the guaranteed person, to "modify, amend, extend or supplement the terms of the Purchase Agreement or any Ancillary Agreement."  Guaranty § 3.  And as highlighted above, the scope of the guaranteed obligations changes automatically to extend to the obligations as amended.  Guaranty § 1(a).

### f.  Airbus Flies in to the Rescue

Despite the infusion of cash from the province of Quebec, Bombardier continued to lose money on the C-Series program.  Am. Compl. ¶ 51.  Bombardier agreed to transfer a 50.01% interest in CSLP to Airbus, the well-known European aircraft manufacturing company.  *Id.* ¶¶ 51, 53.  The press reported that Bombardier had turned over its interest in CSLP to Airbus for "no money upfront to rescue it."  *Id.* ¶ 52.  The agreement documenting Airbus's entry into the CSLP was signed in or around October 2017.  *Id.* ¶ 53.  After the transaction was completed, Bombardier retained approximately 31% of the equity interests in CSLP.  *Id.*  After its acquisition of a majority

interest in CSLP, Airbus renamed the C-Series the "A-220." Eventually, in 2019, CSLP was renamed the Airbus Canada Limited Partnership ("Airbus Canada"). *Id.* ¶ 64.

By late 2017 Bombardier had divested itself of most of its interest in the C-Series—now A-220—aircraft, but it continued to manufacture and sell CRJs. In particular, it sold CRJ model aircraft to Delta. *Id.* ¶ 55. In June 2018, Bombardier and Delta entered into a separate purchase agreement, pursuant to which Delta agreed to purchase a number of CRJ-900 aircraft from Bombardier. *Id.* ¶ 56. Consistent with the parties' past practices and course of dealing as alleged by Delta, "the 2018 purchase agreement for CRJ-900s obligated Bombardier to issue goods-and-services credits to Delta, which, per the contract, Delta could apply towards the purchase price of any good or service sold directly by Bombardier." *Id.*

### g. A Big Amendment in a Small Package

Everything that the Court has described about the history of the contractual relationship between Bombardier and Delta until this point lays the groundwork for "Contract Change Order No. 3"—the amendment to the Purchase Agreement that led to this litigation. As Delta alleges in the complaint, "[f]ollowing Airbus' acquisition of [CSLP], from time to time, Delta and [CSLP] executed certain 'contract change orders' and amendments to the Purchase Agreement and/or its associated Letter Agreements." *Id.* ¶ 57. On December 31, 2018, CSLP and Delta made a number of changes to the Purchase Agreement pursuant to Contract Change Order No. 3. Def.'s Decl. in Supp. of Mot., Ex. 8 (the "Amendment"), Dkt. No. 47-8.

The complaint contains some allegations regarding the purpose of the Amendment, and the parties' intentions in entering into it. Delta alleges that "[o]ne of the purposes of Contract Change Order No. 3 was to document an Agreement between Delta and [CSLP] concerning conversion of certain A-220 aircraft from 100-series 'Firm Aircraft' to 300-series 'Conversion Aircraft.'" Am. Compl. ¶ 60. Delta alleges too that in executing the Amendment, neither party "intended to change

the nature, scope or applicability of the [goods and services credits]."  *Id.* ¶ 63.  But, as discussed

further below, the first port of call to ascertain the parties' intentions in an unambiguous contract is

its language.  And, while short, the Amendment wrought substantial changes to the Purchase

Agreement.

The Amendment's most substantial change was implemented through the creation and of a

new defined term, complete with instructions about how it should be used.  Section 3 of the

Amendment provides the following:

> Article 1.4 of the Agreement is amended to add the following definitions: . . .

> "oo.  **"Seller"** shall mean C Series Aircraft Limited Partnership, a limited partnership
> existing under the laws of the province of Quebec, Canada, as assignee of Bombardier;
> provided any and all references in this Agreement, other than those in Section 19.7, to
> "Bombardier" shall be deemed to be a reference to "Seller"."

With these few brushstrokes, Delta and CSLP agreed to substantial modifications to the

Purchase Agreement *and* each of the letter agreements entered into in connection with it.

Remember that the "Agreement," as defined in the Purchase Agreement, means that agreement

together with the letter agreements entered into in connection with it.  Purchase Agreement § 1.4(d).

This amendment changed nearly every reference in the Purchase Agreement and the letter

agreements to "Bombardier" to read "Seller."  The statement that each reference to Bombardier is

"deemed to be" a reference to Seller unambiguously has that effect.  Because this issue is disputed, a

brief detour from this recitation of the facts to explain why that is the case is warranted.

Black's Law Dictionary defines the word "deem" as follows:

> deem vb. (bef. 12c) 1.  To treat (something) as if (1) it were really something else, or
> (2) it has qualities that it does not have <although the document was not in fact signed
> until April 21, it explicitly states that it must be deemed to have been signed on April
> 14>.  2. To consider, think, or judge <she deemed it necessary>.

*Black's Law Dictionary* (11th ed. 2019).  "'Deem' has been traditionally considered to be a useful word

when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it

is not or negatively by 'deeming' something not to be what it is . . .  All other uses of the word

should be avoided . . . ."  G.C. Thornton, *Legislative Drafting*, 99 (4th ed. 1996).  The simple,

unambiguous effect of the Amendment's instruction to deem references to Bombardier to be

references to Seller is to replace the reference to Bombardier with a reference to Seller—to treat

references to Bombardier as if they were really references to Seller.

Delta marshals a wan argument that the use of "deem" in the Amendment requires the

reader to view references to Bombardier as references to *both* Bombardier *and* Seller.  Mem. in Opp.

to Mot. to Dismiss ("Opp."), Dkt. No. 54 (the Amendment "does not remove any 'references to

Bombardier from the Agreement; it only asks the reader to 'deem' those references as if they are *also*

references to the 'Seller.'" (emphasis added)).  This argument falters for several reasons.  First, it is

simply inconsistent with the plain language meaning of the word "deem."  As described in *Black's*,

the verb asks the reader to treat something as if it was something else—no construction of the word

asks the reader to treat something as if it were *both* something else, and still the thing itself—yet that

is what Delta argues for here.  The single case to which Delta points in making this argument, *Shi

Liang Lin v. U.S. Dep't of Just.*, 494 F.3d 296 (2d Cir. 2007), does not support its position.  There, the

Second Circuit pointed to the text of *Black's* quoted above to support the conclusion that a statutory

reference requiring that required that certain individuals "shall be deemed" to be persecuted by

reason of political opinion, should be read to mandate the conclusion that their political opinion

exists *de jure. Id.* at 307.

Second, Delta's argument disregards the full text of the provision.  The Amendment

provides that any and all references in the Agreement to Bombardier will be deemed to be

references to Seller "other than those in Section 19.7."  Amendment § 3.  The authors of the

Amendment identified one provision of the "Agreement" in which they did not want references to

Bombardier to be swapped with references to Seller.  Delta's proposed interpretation would turn

this language into surplusage.  As the Court will describe in more depth below, in contract

interpretation "the contract should be construed so as to give full meaning and effect to all of its

provisions."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014).

Delta's proposed interpretation of this provision of the Amendment and its effect is both

inconsistent with its plain meaning, and would require the Court to disregard a portion of its text.

        The Amendment had a substantial effect.  Each reference to "Bombardier" in the Purchase

Agreement and each of the letter agreements—except in Section 19.7 of the Purchase Agreement—

should now be read to be a reference to Seller—that is, to CSLP, or, as renamed, Airbus Canada.

Most significantly for purposes of this litigation, it changed the provisions of the two letter

agreements that describe how credit memoranda may be applied.  For example, before the

Amendment Section 3.4 of Letter Agreement '07 provided that such credits could be applied

"towards the purchase price of goods and/or services (excluding aircraft) purchased directly from

Bombardier . . . ."  Letter Agreement '07 § 3.4.  After the Amendment, that provision permits the

credits to be applied "towards the purchase price of goods and/or services (excluding aircraft)

purchased directly from Seller . . . ."

        Delta correctly alleges that Bombardier is not a party to the Amendment.  Am. Compl. ¶ 63.

And Delta correctly alleges that the Amendment does not mention goods and services credits.  *Id.*

But some of Delta's core allegations are belied by the text of the agreement.  For example, Delta

alleges that the Amendment "does not purport to amend Letter Agreement 01, which governs

[goods and services] credits to all 75 'Firm Aircraft' to be delivered under the Purchase Agreement."

Am. Compl. ¶ 63.  But the Amendment amends all references to Bombardier in the "Agreement,"

which, as described above, is specifically defined to include the letter agreements entered into in

connection with the Purchase Agreement.  Delta also alleges that the Amendment does not "purport

to change the parties' substantive rights with respect to the [goods and services] credits, as initially

set forth in the Purchase Agreement." *Id.*  Read literally, that allegation is correct, because the Amendment does not purport to change the parties' substantive rights with respect to those credits—it does change them.  Delta's purported misunderstanding regarding the effect of its Amendment led to this litigation, as the following facts reveal.

### h. Bombardier Refuses to Accept Credit Memoranda Issued as a Result of the Sale of C-Series Planes by CSLP

Up until the date of the complaint filed in this case, Airbus Canada (formerly CSLP), had delivered more than 20 A-220 aircraft (formerly C-Series aircraft) to Delta pursuant to the Purchase Agreement. *Id.* ¶ 65.  "As required by the Purchase Agreement, on the delivery of each aircraft, Airbus Canada has issued a [goods and services] Credit to Delta.  Each such [goods and services] Credit is reflected in an invoice issued to Delta by Airbus Canada." *Id.* ¶ 66.  The invoices issued by Airbus Canada to Delta reference the Purchase Agreement "and further provide that 'Issued upon delivery' is a 'Goods, Services & Support Credit Memo.'" *Id.* ¶ 67.

In June 2019, one of Delta's subsidiaries placed orders with Bombardier for CRJ-related goods and services. *Id.* ¶ 68.  Through its subsidiary, Delta tried to use credit memoranda that it had received under the letter agreements described above as a result of its purchase of A-220s from Airbus Canada to its order from Bombardier related to CRJs. *Id.*  To be very clear, let's recap what Delta was asking for at this point:  Delta bought planes from Airbus Canada—a company in which Bombardier retained only a minority interest.  Airbus Canada issued credits to Delta as a result of the sale of those planes.  Delta then tried to use the credits from the purchase of planes from Airbus Canada to acquire goods and services from Bombardier for a different class of planes manufactured by it.  To Delta's apparent surprise, Bombardier did not accept the credits issued to Delta as a result of the sale of planes by another company.  Instead, "Bombardier insisted that Delta pay cash for the CRJ-related goods and services that Delta had ordered." *Id.* ¶ 69.  Delta disagreed with

Bombardier's decision, but it ultimately paid cash to Bombardier for its goods and services.  There is no allegation that Airbus Canada has failed to honor the goods and services credits issued by it.

### i.   Bombardier Exits Commercial Aviation:  Sales to Airbus and Mitsubishi

In January 2020, the press reported that Bombardier was considering a complete exit from Airbus Canada.  *Id.* ¶ 72.  The stories continued into early February, when the Wall Street Journal reported that Airbus was in advanced talks to buy out Bombardier's remaining stake in Airbus Canada.  *Id.* ¶ 73.  And in February, the deal was consummated:  Bombardier sold its remaining stake in Airbus Canada for approximately $591 million.  *Id.* ¶ 74.  *Forbes* magazine reported that the sale to Airbus "marks Bombardier's exit from commercial aviation . . . ."  *Id.*

The sale to Airbus stripped Bombardier's remaining interest in the C-Series (now A-220) program.  A separate sale to Mitsubishi ended Bombardier's business in commercial aviation.  "Prior to exiting the Airbus Canada partnership, Bombardier announced that it had entered into a definitive agreement to sell its commercial jet program to Mitsubishi."  *Id.* ¶ 75.  Mitsubishi was in the business of manufacturing airframes.  *Id.* ¶ 77.  The sale closed on June 1, 2020.  *Id.* ¶ 79.  The complaint alleges that the sale constituted a sale of "a material portion of Bombardier's assets."  *Id.* ¶ 76.  According to Delta, the sale to Mitsubishi violated Section 19.7 of the Purchase Agreement because Bombardier did not require Mitsubishi to provide written assurances to Delta that Mitsubishi would assume Bombardier's obligations under the Purchase Agreement and the related agreements.  *Id.* ¶ 78.

### j.   Bombardier Refuses Delta's Demand

On February 3, 2020, Delta's legal counsel provided notice to Bombardier that, in Delta's view, Bombardier had breached the Purchase Agreement due to its refusal to accept goods and services credits from Delta.  *Id.* ¶ 82.  Bombardier eventually responded to the demand.  "In its response, Bombardier claimed that the [goods and services] Credits apply only to goods and services

relating to A-220 aircraft and cannot be used for CRJ-related goods or services." *Id.* ¶ 85. Bombardier denied any obligation to accept credits generated by the sale of A-220 planes by Airbus Canada. *Id.* Shortly thereafter, Delta initiated this lawsuit.

### k.   Procedural History

Delta filed this case on April 24, 2020.  Dkt. No. 1.  The complaint was not filed on the docket until May 22, 2020, however, as Delta litigated the issue of whether the unredacted complaint could remain under seal.  *See* Dkt. Nos. 3, 15.  A version of the complaint with limited redactions was filed on May 29, 2020.  Dkt. No. 17.  Following a discussion regarding a proposed motion to dismiss the initial complaint, Delta filed an amended complaint on June 30, 2020.  Am. Compl.

In the operative complaint, Delta asserted that Bombardier had breached its contractual obligations in a number of ways.  First, Delta asserts that Bombardier breached the Purchase Agreement.  In Delta's view, Bombardier breached the agreement by failing to honor the goods and services credits issued to Delta by Airbus Canada.  *Id.* ¶¶ 88–95.  Delta asserts that Bombardier also violated that agreement through its sale of the commercial aircraft business to Mitsubishi, because Mitsubishi did not provide assurances required under the Purchase Agreement when it purchased Bombardier's aircraft business.  *Id.* ¶¶ 96–100.  Second, Delta asserts that Bombardier's failure to honor the credit memoranda by Airbus triggers Bombardier's indemnification obligations under the Assignment Agreement.  *Id.* ¶¶ 101–107.  Finally, Delta asserts that Bombardier has breached the terms of the Guaranty.  *Id.* ¶¶ 108–114.

Bombardier filed a motion to dismiss in response to the amended complaint.  Dkt. No. 46. Delta filed a memorandum of law in opposition.  Dkt. No. 54.  Bombardier's reply was filed shortly thereafter.  Dkt. No. 58.

## II.   LEGAL STANDARD

### a.   Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010) (alterations in original) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). To avoid dismissal, a complaint must allege "sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

In addition to the complaint, courts may consider the facts from "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint," including contracts. *DiFolco*, 622 F.3d at 111 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) and *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). And though the Court must accept the facts as alleged in the complaint as true, "[w]hen allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002) (citation omitted). In deciding this motion to

dismiss, the Court has considered the Agreement and its amendments because they are integral to the complaint.

### b. Contract Interpretation Under New York Law

The Purchase Agreement is governed by New York law. Am. Compl. ¶ 89. The Assignment Agreement and the Guaranty are as well. Assignment Agreement § 7.2; Guaranty at ECF p. 7. Under New York law, to state a claim for breach of contract "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). "When interpreting a contract, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp.*, 773 F.3d at 113–14 (ellipsis omitted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners

19

of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 864 F.3d at 99 (2d Cir. 2017) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).  Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).  "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation:  words and phrases should be given their plain meaning and a contract should be construed as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole.").  But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather,

"a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted).

On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). In other words, courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

When parties agree to modify their contract "the modification establishes a new agreement between the parties which supplants the affected provisions of the underlying agreement while leaving the balance of its provisions unchanged." *Benipal v. Herath*, 674 N.Y.S.2d 815, 816 (3d Dep't 1998); *see also Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354, 429 N.Y.S.2d 715 (2d Dep't 1980) ("The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of it intact."). Where, as here, the court is considering a claim for breach of contract of an amended agreement, the operative agreement is the agreement as amended. "The modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties." 22A N.Y. Jur. 2d *Contracts* § 476 (2021).

21

### III.    DISCUSSION

> ### a.   Bombardier Did Not Breach the Purchase Agreement by Not Honoring
> ### Goods and Services Credits Issued by Airbus Canada

Bombardier did not breach the Purchase Agreement (or Letter Agreements '01 and '07)

when it declined to redeem goods and services credits issued to Delta by Airbus Canada.  As

described above, the Amendment clearly changed the terms of each of the relevant provisions of the

letter agreements.  As amended, the letter agreements permit the credits issued by Airbus Canada to

be applied "towards the purchase price of goods and/or services (excluding aircraft) purchased

directly from *Seller* . . . ."  Seller is Airbus Canada.  As amended, the letter agreements

unambiguously permit the application of the credits to buy goods and services from Airbus Canada,

not Bombardier.

The modifications to the Purchase Agreement and letter agreements implemented by the

Amendment are not inconsistent with Section 19.7 of the Purchase Agreement.  As described above,

the Amendment changed references to "Bombardier" to references to "Seller" throughout the

"Agreement" except in Section 19.7 of the Purchase Agreement.  That section of the agreement

prohibits assignments by Bombardier of its rights under the Purchase Agreement, and provides, in

part, that any assignment "shall be subject to . . . no increase to or adverse change in the cost, risk,

obligations, liability or responsibility of Buyer . . . ."  Purchase Agreement § 19.7.  Delta argues that

the Court should not adopt Bombardier's invitation to read the Amendment's "identification of

CSALP as the 'Seller' in isolation, and to achieve what the assignment itself could not – i.e., a

complete elimination of Bombardier's obligation to issue or accept Credits, combined with a

dramatic reduction in the value of those Credits to Delta."  Opp. at 20.  Whether the Amendment's

modifications of Delta's rights could have been implemented through an assignment by Bombardier,

however, is a red herring.  Regardless of whether Bombardier could limit Delta's rights through an

assignment, Section 19.17 does not limit Delta's ability to modify its own rights through the

Amendment that it entered into with CSLP.  Any increased costs resulting from the change in the terms of the letter agreements were not the result of the assignment or other conduct by Bombardier.  Bombardier was not a party to the Amendment.  Delta agreed to the terms of the Amendment with CSLP—the assignment provision of the Purchase Agreement does not protect it from the consequences of its own decision-making.

Because the relevant contracts as amended are unambiguous, the parties' course of dealing regarding the use of credits in other cases does not change the Court's analysis.  Delta raises an argument that it had a course of dealing with Bombardier—one in which Bombardier always agreed to permit the goods and services credits issued upon the sale of one model of CRJ purchased from Bombardier to be used toward goods and services for any other model of CRJ.  Opp. at 18.  Delta argues that the course of dealing permitting the use of credits earned through the sale of one model of CRJ to purchase goods and services for another model of CRJ supports its construction of its agreements with Bombardier regarding the C-Series.

This argument is founded on Section 2-202 of the U.C.C., which provides the following:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of performance, course of dealing, or usage of trade (Section 1-303); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

N.Y. U.C.C. § 2-202.  Under the statute, a "course of dealing" "is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." N.Y. U.C.C. § 1-303.

The alleged course of dealing between Bombardier and Delta in connection with the sales of CRJs does not impact the Court's analysis of the breach of contract claim for two principal reasons. First, as the statutory text itself makes clear, U.C.C. § 2-202 does not permit the introduction of extrinsic evidence of a course of dealing to contradict the terms of an unambiguous contract. "[I]f the language of a contract is unambiguous, as here, parol evidence is not admissible." *C.P. Apparel Mfg. Corp. v. Microfibres, Inc.*, 210 F. Supp. 2d 272, 273–74 (S.D.N.Y. 2000); *see also Alaska Russia Salmon Caviar Co. v. M/V "MARIT MAERSK"*, No. 98 CIV. 7685 (DLC), 2000 WL 145124, at *3 (S.D.N.Y. Feb. 2, 2000); *Intershoe, Inc. v. Bankers Tr. Co.*, 77 N.Y.2d 517, 522, 571 N.E.2d 641, 644 (1991) (noting that U.C.C. 2–202 precludes evidence that contradicts the stated terms of an agreement). The "Agreement" as amended by the Amendment is unambiguous; parol evidence of the parties' course of dealing should not be considered to interpret it.

Second, Delta's argument ignores the simple fact that the counterparty to the Amendment—Airbus Canada—is a different company from Bombardier. Delta and CSLP entered into the Amendment in December 2018. At that time, Bombardier was a minority equity holder in CSLP—Airbus owned a majority of the company. A "course of dealing" "is a sequence of conduct concerning previous transactions *between the parties to a particular transaction* that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." N.Y. U.C.C. § 1-303 (emphasis added). As Delta acknowledges in the complaint, Bombardier was not a party to the Amendment. Am. Compl. ¶ 63. Here, the Court is charged with interpreting the effect of the relevant contracts as amended by the Amendment, not the agreements as they were in effect previously. Delta points to no course of dealing between the parties to the Amendment, namely Delta and Airbus Canada, that would favor Delta's proposed interpretation of its effect.

Because the language of the Purchase Agreement after giving effect to the Amendment is clear, the Court need not determine whether the Purchase Agreement permitted the application of goods and services credits to aircraft other than the C-Series. Bombardier argues that even before the Amendment, credit memoranda issued upon sales of C-Series aircraft could not be applied to buy goods and services for other categories of aircraft, such as the CRJs. Bombardier argues that this is the case based, in part, on the heading of Section 1.1 of Letter Agreement '01:

> Article 1.4 of [Letter Agreement '01] says that "[o]n delivery of each Aircraft," Delta shall receive a [goods and services] Credit that it can use for the goods and services described in Article 1.1. Ex. 4. Article 1.1 is titled "Aircraft Credit Memorandum," and Article 1.4 of the PA, in turn, defines "Aircraft" as the "C Series." By its express language, LAI thus always limited the type of aircraft to which Delta could apply the credits to the C Series (now the Airbus A-220).

Mem. Law in Supp. Mot. to Dismiss ("Mem."), Dkt. No. 48, at 11 (internal citations omitted). Bombardier also argues that the provision of the Purchase Agreement permitting the assignment to CSLP would not make sense if credit memoranda could be applied to CRJs as well as C-Series plans. In support of that argument, Bombardier muses regarding the rationality of permitting Bombardier to transfer such obligations to CSLP since CSLP had no capacity to make good on them. "The only way that the parties could have contemplated Bombardier assigning its obligations under [Letter Agreement '01] to CSALP was if [Letter Agreement '01] only applied to C Series aircraft. That is, CSALP had no ability to provide goods and services related to CRJs or any other aircraft model." *Id.*

While the Court need not resolve this question, the Court observes as dicta that neither of these arguments has the clarity of Bombardier's arguments related to the effect of the Amendment. Article 1.4 of Letter Agreement '01, does state that the credit memoranda will be issued "[o]n delivery of each Aircraft." Letter Agreement '01 § 1.4. And "Aircraft" was clearly defined to refer to the C-Series. But that language arguably describes only the triggering event for the issuance of credits; it does not plainly prescribe how the credits are to be applied.

The language of the letter agreements regarding the application of goods and services credits does not by itself expressly limit the application of credits to goods and services related to Aircraft. Instead, as described above, the original language of the agreements permitted the application of the credits "towards the purchase price of goods and/or services (excluding aircraft) purchased directly from Bombardier . . . ." Arguably, the use of the lowercased term "aircraft" in this text, rather than uppercased "Aircraft" could suggest that the drafters contemplated the application of the credits to goods and services for aircraft other than the C-Series. Otherwise, a reference to capitalized "Aircraft" would have been sufficient. On its face, this language does not limit the application of credits to good or services associated with Aircraft.

Bombardier's argument that a limitation should be implied from the section heading's reference to "Aircraft Memoranda" faces several challenges. First, as described above, the Purchase Agreement states that "[t]he headings in this Agreement are included for convenience only and shall not be used in the construction and interpretation of this Agreement." Purchase Agreement § 1.2. This disclaimer limits the substantive impact of the heading in the Court's analysis. Second, all of the words in the relevant headings are capitalized. It is difficult to conclude definitively, therefore, that the reference to "Aircraft" in the heading is a reference to the uppercased defined term, as opposed to a reference to lowercased "aircraft," which has been capitalized merely because it is contained in the heading. Third, accepting that the heading "Aircraft Memoranda" refers to the defined term "Aircraft," the heading could simply refer to the event triggering the issuance of the credits, rather than the manner of their application. And fourth, the equivalent heading in Letter Agreement '07 is titled merely "Credit Memoranda." Letter Agreement '07 § 3. If the insertion of "Aircraft" in the heading to Letter Agreement '01 has any meaning in the construction of that agreement, it is worthy of note that the argument does not appear to apply at all in the case of goods and services credits issued under Letter Agreement '07.

Bombardier's argument that broad application of goods and services credit to aircraft other than the C-Series is inconsistent with the assignment provision of the Purchase Agreement also faces some hurdles.  First, it relies not only on the text of the agreement—the first port of call for contract interpretation—but on an argument regarding the economic rationality of the interaction between the provisions.  Second, the logical incoherence that Bombardier describes as the basis for its argument is arguably not so great.  At the time of the Purchase Agreement, it appears that it was anticipated that Bombardier would be the majority equity holder in CSLP, with the government of Quebec as a minority investor:  a sale of an aircraft by CSLP would be a sale by what might have been a consolidated subsidiary of Bombardier.  In those circumstances, Bombardier would not be giving something for nothing—the parent company would be honoring credits to encourage sales at its subsidiary.  Bombardier's argument also arguably gives short shrift to the requirement that Bombardier remain jointly and severally liable for the obligations of CSLP following an assignment. Assignment Agreement § 19.7.  As a result, even if CSLP could not satisfy the obligations to honor broad based credits, Bombardier would be required to do so.[4]

### b.  Delta Has Not Adequately Pleaded that Bombardier's Sale to Mitsubishi Violated the Purchase Agreement

Bombardier has not adequately pleaded a violation of Section 19.8 of the Purchase Agreement as a result of the sale of its commercial jet business to Mitsubishi.  Here too, that is because of the unambiguous effect of the Amendment on the Purchase Agreement.  Section 19.8 of the Purchase Agreement as initially executed reads as follows:

In the event Bombardier enters into any merger with or sale of all or a material portion

---

[4] As an aside, purely as dicta, the Amendment's modification of the goods and services credit provisions of the letter agreements makes economic sense if the letter agreements did initially provide for the issuance of goods and services credits for any product sold by Bombardier, rather than being limited to the Aircraft, as Delta argues.  At the time of the Amendment, Bombardier's interest in CSLP had been reduced to a minority position.  Changing the deal regarding the application of goods and services credits at that time to limit them to products sold by CSLP would be understandable: the Amendment may have been intended to have exactly the effect that its language provides—namely, to cut off the incurrence of liability on the part of Bombardier upon the sale of aircraft by CSLP, given the reduction of Bombardier's interest in the company, and Bombardier's oft-alleged desire to stem the bleeding associated with the C-Series program.

> of its stock or assets to another airframe or engine manufacturer in which Bombardier
> is not the surviving entity or in the event Bombardier enters into any transaction to
> sell a majority interest in the C Series program to another airframe or engine
> manufacturer, Bombardier shall require such airframe or engine manufacturer to
> provide written assurances to Buyer that it will support Buyer's C Series with the
> breadth and quality of product support that is comparable to what the acquirer is
> providing Buyer in support of its other fleets of similar size, vintage and technology
> . . . .

Purchase Agreement § 19.8.  If the Purchase Agreement still read in that way in June 2020, when the

Mitsubishi transaction was consummated, Delta would have adequately pleaded a breach of the

contract.  Bombardier is alleged to have sold a material portion of its assets to Mitsubishi, another

airframe manufacturer, without providing the requisite assurances.

However, as a result of the Amendment, at the time of the Mitsubishi transaction, Section

19.8 read as follows:

> In the event Seller enters into any merger with or sale of all or a material portion of its
> stock or assets to another airframe or engine manufacturer in which Seller is not the
> surviving entity or in the event Bombardier enters into any transaction to sell a majority
> interest in the C Series program to another airframe or engine manufacturer, Seller
> shall require such airframe or engine manufacturer to provide written assurances to
> Buyer that it will support Buyer's C Series with the breadth and quality of product
> support that is comparable to what the acquirer is providing Buyer in support of its
> other fleets of similar size, vintage and technology . . . .

Seller, again, is Airbus Canada, not Bombardier.  Asset sales by Bombardier do not run afoul of this

provision.

This construction of the Purchase Agreement is supported by the remaining text of Section

19.8 of the Purchase Agreement.  Section 19.8, as amended, requires that Seller obtain written

assurances from a transferee of its airframe business that it will "support Buyer's C Series."

Purchase Agreement § 19.8.  At the time of its transaction with Mitsubishi, Bombardier had already

exited the C-Series business, which had been assumed by Airbus Canada.  Delta's argument that

Section 19.8 required Bombardier to obtain written assurances from Mitsubishi regarding the C-

Series does not cohere logically.  Bombardier had already exited that business.  Mitsubishi was

acquiring Bombardier's other commercial jet business, including the CRJ business: how could it be expected to provide assurances regarding the C-Series? However, the provision is logically coherent under the Court's interpretation of the Purchase Agreement as amended by the Amendment: Airbus Canada, the company that operates the C-Series business, is required to obtain assurances regarding that business from substantial transferees of its assets. To the extent that Delta has contractual protections related to the sale of Bombardier's CRJ business to Mitsubishi, they are not to be found in the Purchase Agreement as amended by the Amendment.

In sum, because Delta's breach of contract claim related to the Purchase Agreement and the associated letter agreements is not supported by the unambiguous text of the Purchase Agreement as amended by the Amendment, that claim is dismissed.[5]

### c. The Assignment Agreement Does Not Require Bombardier to Indemnify Delta for the Consequences of the Amendment

The indemnification provision of the Assignment Agreement does not require Bombardier to indemnify Delta because its inability to use goods and services credits do not arise from the assignment to CSLP, but from Delta's own agreements in the Amendment. In the complaint, Delta alleges that "Bombardier's refusal to accept the [goods and services] credits from Delta has increased Delta's costs, risks, and liabilities under the Purchase Agreement." Am. Compl. ¶ 106. Delta asserts that the indemnification provision in the 2016 Assignment Agreement requires Bombardier to "indemnify Delta from any and all claims, demands, causes of action, liabilities, judgments, losses,

---

[5] While the Court's ruling rests purely on the construction of the clear language of the agreements as amended, not an assessment of the economics or subjective intentions behind the parties' contract, the Court also notes as an aside that this seems a far cry from an illogical result. Bombardier and Airbus Canada are different companies. By December 2018, Bombardier had a minority interest in Airbus Canada. Since early 2020, Bombardier has owned no equity in the company whatsoever. But now, Delta is asking Bombardier to give it value in exchange for Delta's purchase of airplanes from Airbus Canada. Nothing in the complaint suggests that Bombardier receives any value from the sales of A-220 by Airbus Canada in return. One could understand that Delta is asking Bombardier to give it something for nothing. The effect of the Amendment is to permit Delta to redeem credits from the manufacturer of the aircraft that it purchased, rather than a now-unaffiliated third party. Similarly, that Delta does not find protection against the sale of Bombardier's CRJ business in the Purchase Agreement related to the C-Series planes following Bombardier's divestment of its interest in C-Series assets does not appear to be economically irrational.

damages, costs, and expenses of any kind whatsoever resulting from or arising out of any increase to or adverse change in the cost, risk, obligations, liabilities, or responsibility of Delta under the Purchase Agreement." *Id.* ¶ 104. Because Bombardier refused to honor Delta's demand for Bombardier to indemnify Delta for the increased costs to it associated with Bombardier's failure to honor goods and services credits issued by Airbus Canada, Delta claims that Bombardier is in breach. *Id.* ¶ 106.

Delta's argument founders on the plain language of the relevant provision of the assignment agreement. It is, perhaps, for that reason that Delta's complaint describes the language of the agreement in an incomplete manner. The full text of the relevant provision is set forth below. The Court has highlighted the language omitted from Delta's description of the provision in its complaint.

> Bombardier shall indemnify Delta against and shall hold Delta harmless from, any and all claims, demands, causes of action, liabilities, judgments, losses, damages costs and expenses of any kind whatsoever, (including, without limitation, court costs and attorneys' fees) resulting from or arising out of any increase to or adverse change in the cost, risk, obligations, liabilities or responsibility of Delta under the Purchase Agreement or any Ancillary Agreement, including with respect to taxes *, as a result of the assignment of the Purchase Agreement and the Ancillary Agreements to CSALP under and as provided in this Assignment Agreement.*

Assignment Agreement § 5 (emphasis added).

The language ignored by Delta is significant: it undermines Delta's claim. The complaint does not plausibly allege that any increase in Delta's costs resulted from the assignment to CSLP under the Assignment Agreement. The Assignment Agreement did not change the nature of Delta's rights to goods and services credits. Section 7.1 of the Assignment Agreement provides that it should not be read to alter or amend such terms of the Purchase Agreement and the letter agreements. *Id.* § 7.1. Instead, the increase resulted from Delta's own agreement with CSLP to

modify its deal with CSLP in the Amendment.[6]  The Assignment Agreement's indemnification provision does not protect Delta from costs that are the result of its own decision to enter into the Amendment.

### d.  Delta Has Not Adequately Pleaded a Breach of the Guaranty

Delta's third cause of action for breach of the Guaranty fails to state a claim for at least two reasons.  Delta describes this claim as follows:  "To the extent Airbus Canada failed to facilitate Delta's application or Bombardier's acceptance of [goods and services] Credits towards the purchase price of goods and services purchased directly from Bombardier, Bombardier is obligated to guaranty Airbus Canada's performance."  Am. Compl. ¶ 113.  Bombardier fairly describes this allegation as "convoluted."  Mem. at 15.  But its lack of merit is clear.

The claim cannot proceed because it is predicated on the continuing existence of an obligation on the part of Bombardier to honor goods and services credits issued by Airbus Canada. Moreover, the claim rests on a set of facts that are not pleaded in the complaint.  Delta alleges that the alleged breach occurred "*[t]o the extent* Airbus Canada failed to facilitate Delta's application or Bombardier's acceptance of [goods and services] credits . . . ."  Am. Compl. ¶ 113 (emphasis added). But the complaint does not allege that Airbus Canada failed to do either of those things—or that Airbus Canada was required to do either of them.  Delta must plead facts to support its claim, not a hypothetical.  For these reasons, this claim fails.

### IV.    LEAVE TO AMEND

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires."  "Reasons for a proper denial of leave to amend include undue

---

[6] Bombardier argues that because goods and services credits were always limited to the C-Series, there was no change in the nature of Delta's costs at any point after the Assignment Agreement.  Mem. at 15.  The Court has not reached that conclusion in this opinion.  Read in the light most favorable to Delta based on the plain reading of the contracts, the modification to its rights to claim goods and services credits happened when it entered into the Amendment.

delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citation omitted). Any amendment to Plaintiff's claims for breach of the Purchase Agreement, the Assignment Agreement, and the Guaranty would be futile because the contracts at issue are unambiguous. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (holding that where the "problem with [a complaint] is substantive [and] better pleading will not cure it," leave to amend should be denied as futile).

### V.  CONCLUSION

Delta and Airbus Canada agreed to modify nearly all of the provisions of the "Agreement" to replace references to Bombardier with references to Airbus Canada. Delta's contention that it did not intend all of the natural consequences of that change do not register, because the terms of the agreements as amended by the Amendment are clear and unambiguous. As a result, Defendant's motion to dismiss is GRANTED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 46, to enter judgment for Defendant, and to close this case.

SO ORDERED.

Dated:  March 25, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge